Filed 7/28/26 AOK Tooling Limited v. Stop C-19 CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| AOK TOOLING LIMITED, | B349041 |
| Plaintiff, Cross-defendant, and Appellant, | (Los Angeles County Super. Ct. No. 21STCV23918) |
| v. | |
| STOP C-19, LLC, | |
| Defendant, Cross-complainant, and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge. Affirmed in part, reversed in part.

Troutman Pepper Locke, Peter N. Villar, Bryan M. Sonksen, and Elizabeth Holt Andrews for Plaintiff, Cross-defendant, and Appellant.

Law Offices of Steven P. Scandura, Steven P. Scandura; and Howard Posner for Defendant, Cross-complainant, and Respondent.

This is the second appeal following a bench trial between AOK Tooling Limited (AOK) and Stop C-19, LLC (Stop) concerning a commercial dispute over Covid-19 era masks made by AOK for delivery to Stop. In the first appeal, we vacated an amended judgment that found in AOK's favor on Stop's unjust enrichment cross-claim because the trial court lacked jurisdiction to enter a new and different judgment due to the expiration of a statutory deadline. This meant the original judgment continued to govern, which found in Stop's favor on its unjust enrichment claim. We also stated, "Should AOK have meritorious appellate arguments, it may appeal from the original judgment once the trial court reinstates it upon remand." (*Stop C-19, LLC v. Tooling Express, Inc.* (2025) 111 Cal.App.5th 803, 816 (*Stop I*).) AOK now does so, limiting its challenge to the award in favor of Stop on its unjust enrichment claim.

AOK argues there is no recognized cause of action for unjust enrichment, and that Stop cannot recast its claim as a quasi-contractual one because the parties had an enforceable contract. AOK also argues that the factual theory underlying Stop's unjust enrichment claim as pleaded differed materially from the claim Stop made for the first time at closing argument (and upon which judgment was granted), and that it would prejudice AOK to belatedly deem Stop's unjust enrichment claim as one for rescission under Civil Code section 1689.[1] Finally, AOK contends judicial estoppel prevents Stop from contending in this appeal that the parties' contract did not contain a term requiring a certain regulatory approval of the masks (thus making a non-contractual theory of unjust enrichment plausible)

_____

[1] Unspecified statutory references are to the Civil Code.

because Stop successfully contended before the trial court in defeating AOK's breach of contract claim that the contract did require that approval.

We agree with these contentions, reverse the finding in Stop's favor as to its unjust enrichment claim, and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Summary

AOK incorporates the record from the first appeal in this appeal, and we therefore derive some of our factual summary from our prior opinion, *Stop I*, *supra*, 111 Cal.App.5th 803 including the unpublished portion. (Cal. Rules of Court, rule 8.1115(b)(1).)

#### 1. *The Parties*

"Stop, whose principal place of business is Los Angeles, California, is co-owned by John Baron Wong and Gredale, LLC (Gredale). A man named Greg Lorber owns Gredale.

"AOK, owned by Jerry Mei Sheng Teng (Teng), is a Chinese manufacturer of personal protective equipment including [National Institute for Occupational Safety and Health (NIOSH)]-approved N95 masks. Tooling (also owned by Teng) is AOK's affiliate and has a warehouse in Southern California. Stop claims that Chyi Gary Chen was Tooling's chief executive officer . . . . Chen testified that he was AOK's director of operations . . . . We refer to Tooling, Teng, and Chen collectively as the Tooling defendants." (*Stop I*, *supra*, 111 Cal.App.5th [nonpub. portion of partially pub. opn.].)

2. *The Contract*

"On November 10, 2020, AOK and Stop entered into a contract for Stop to purchase 50 million masks from AOK at the price of $1.10 per mask, or $55 million total. The parties agreed AOK would deliver the masks in batches, with Stop issuing monthly purchase orders." (*Stop I*, *supra*, 111 Cal.App.5th [nonpub. portion of partially pub. opn.].)

"Under the contract, Stop . . . would 'pick up the goods' from AOK in China. Stop was to pay for each batch of goods within two days of receiving AOK's notice of delivery." (*Stop I*, *supra*, 111 Cal.App.5th [nonpub. portion of partially pub. opn., fn. omitted].)

"The masks were a cup-design model . . . that NIOSH had already approved." (*Stop I*, *supra*, 111 Cal.App.5th [nonpub. portion of partially pub. opn.].) Article 1, section 2 of the contract stated, "The technical standards (including quality requirements) of [AOK]'s products comply with NIOSH (N95), an American executive standard." The contract also required AOK to print Stop's logo on the masks. Article 1, section 4 stated, "[AOK] guarantees that [Stop]'s logo will be printed on the products and packages agreed in the contract, but [Stop]'s logo shall be approved by [AOK]." The parties also agreed that the brand name "M.Mask" printed on the NIOSH-approved mask model would be removed.

As discussed below, changing the logo on the masks required further NIOSH approval. At trial, Wong testified that Article 1, section 4 "indicate[d] that AOK would need to obtain approval to place Stop C-19's logo on the [masks]" and that the contract implied that AOK would obtain such approval prior to production.

4

### 3. *NIOSH Approval and Changing the Mask's Logo*

In mid-November 2020, Stop signed the contract and arranged for payment of the required deposit. Wong then asked AOK manager Dai Jianguo (Dai), "[H]ow many containers will be ready next week?"

A few days later, Dai forwarded an email from NIOSH to Wong. NIOSH stated that changing the M.Mask label on the mask "would require an extension of approval to remove it." Dai's email to Wong explained that changing the logo on the masks required AOK to submit an application to NIOSH and that it was "estimated that it will take two months to change it." Wong asked Dai to apply for the change and stated, "Looking forward to your [c]ontainers."

Ren Feng (Stop's hired intermediary for its contract discussions with AOK) also emailed Wong that deleting "M.Mask" and adding Stop's logo would require an application to NIOSH. On November 30, 2020, Wong asked Ren by email whether NIOSH agreed to "delete[] . . . M. Mask and add[] 'Stop C-19'?" The record does not include a response to Wong's email.

At trial Wong denied that he knew in November 2020 that NIOSH had not yet approved adding Stop's logo to the masks. He claimed he first learned that NIOSH had not approved the masks with Stop's logo when United States Customs and Border Protection (CBP) seized five containers of masks for infringing on the NIOSH trademark, which Wong identified as occurring in March 2021. Wong claimed he would not have accepted the masks if he had known they lacked NIOSH approval.

### 4. *Stop's Initial Orders*

Between November 25 and December 7, 2020, Stop paid approximately $3.7 million to AOK for 3,364,800 masks bearing

5

Stop's logo.  Those masks arrived in Los Angeles in 13 shipping containers.  Due to port congestion, Stop did not receive the first of these containers until on or about December 30, 2020.  On January 18, 2021, Wong emailed AOK that "[c]ustomer response has been very positive."

   5.   *Containers Shipped Under a Special Agreement*

   "Lorber testified Stop received the first 13 containers under the contract 'and then there was an additional four containers that went with [a] special agreement.'[2]  At trial, the parties disagreed about the terms of this special agreement, including when Stop had to pay for the four containers and whether AOK would release any of the four containers if Stop did not pay for all of them."  (*Stop I*, *supra*, 111 Cal.App.5th [nonpub. portion of partially pub. opn.].)

   In January 2021, Dai invoiced Stop for $580,800 for 528,000 masks, which would be sent in two containers.  Dai emailed Wong, "[Stop is to w]ire payment for [two] containers and AOK will cooperate by shipping [four] containers[.]  [Stop will] pay for two more containers then AOK will release the [bill of lading]."  Wong forwarded proof of Stop's $580,000 payment to Dai and stated, "I look forward to the next four containers."

   A message from Ren in an AOK and Stop chat group states that Stop needed to pay for the "remaining two containers" "before they arrive[d] at the U.S. port.  If not, the two containers that they already paid for will not be discharged."

_____

   **2** "Other witnesses referred to this agreement as a 'special arrangement.'  For the sake of consistency, we use 'special agreement' throughout."  (*Stop I*, *supra*, 111 Cal.App.5th [nonpub. portion of partially pub. opn.].)

On February 7, 2021, AOK emailed Wong that if it did not receive payment for the remaining containers, it would offer the masks for sale to someone else.  Wong responded that he authorized only two containers and that he would not authorize any more containers "until the U[.]S[.] market respond[s] to the lower [Stop] price of $1.45 [per mask] to compete with 3M. . . .  [¶] $1.45 is lower than [Stop's] cost[.]  Your [price of] $1.10 is too high to compete in the U[.]S[.] market."

At trial, Wong testified that after Stop dropped its per mask sale price to $1.45, it no longer made a profit.  He nevertheless denied that changing market conditions prevented Stop from selling its inventory.

On February 9, 2021, AOK's freight forwarder emailed Wong that four containers would be delivered to Tooling's warehouse, and the two paid-for containers were dropped off there on March 2, 2021.[3]  When asked whether Wong made any effort to recover the two containers, Wong responded that he did not handle operations.  AOK also shipped the two unpaid-for containers.  There is no evidence that Stop attempted to obtain these masks at any time.

6.    *Stop Experiences Difficulty in Selling the Masks*

As mentioned previously, in February 2021, Wong informed AOK that the per mask cost was too high for Stop to be competitive in the United States market.  Further, although Stop had orders for the initial 13 containers of masks it received, each box of masks contained a slip of paper stating the masks were

---

[3] A CBP entry summary form for 528,000 face masks listed the value of the goods as $353,760.  Chen testified this value reflected AOK's cost to make the masks.

"nonmedical."[4] Stop's customers complained that they did not want "nonmedical" masks. Lorber clarified that hospitals could use nonmedical NIOSH-approved N95 masks under an emergency use authorization, but Stop's customers returned or rejected the masks.

On February 25, 2021, Chen met Wong at Stop's warehouse, which was approximately 95 percent full. According to Chen, Wong stated that Stop could not accept additional shipments, that he understood AOK could not release the containers without Stop first paying for them, and that Stop did not want the containers at the time because the warehouse was too full.

On March 1, 2021, Chen emailed Wong that Stop's "continued failure to make the payments" was a breach of contract. Chen informed Wong that if Stop did not make payment, AOK would have to sell the inventory to other customers. Wong testified that at the time he received this email, Stop had indicated that it did not want any more N95 masks. Receiving no response from Wong, Tooling shipped the masks to a customer in Peru for sale.

Lorber testified that Stop sold only 15 percent of the AOK masks.

7. *AOK Admits It Did Not Apply for NIOSH Approval*

At trial, the parties stipulated that the mask model at issue was NIOSH approved and certified, but the addition of Stop's logo required an extension of approval that was never obtained. Both Chen and Teng testified that AOK did not apply to NIOSH

---

[4] AOK's expert in Chinese trade law testified that Chinese legislation required the "nonmedical" disclaimer.

for approval of masks with Stop's logo. The trial court asked Teng why AOK did not attempt to obtain the required approval. He responded that AOK needed documentation from Stop that it did not receive. The court then asked what AOK did to get the process started. Teng testified that he provided the information to Wong and told him the process would take two months.

## B. Procedural Summary

### 1. *The Parties' Claims*

On June 10, 2021, Stop sued the Tooling defendants for selling the 528,000 masks that Stop had paid for to a customer in Peru (case No. 21LBCV00320).

On June 28, 2021, AOK filed a complaint against Stop and Wong for, among other things, breach of contract (case No. 21STCV23918). AOK alleged the parties' contract required Stop to purchase 50 million masks, but after paying for approximately 3.6 million masks, Stop did not accept further deliveries. AOK claimed it suffered at least $22 million in lost profits and damages, including the costs of raw materials purchased in reliance of Stop's contractual commitment and storage and re-exportation costs.

On September 3, 2021, the court related the two matters.

On September 13, 2021, Stop cross-complained against AOK for, among other claims, intentional and negligent misrepresentation, civil theft, conversion, unjust enrichment, and unfair business practices pursuant to Business and Professions Code section 17200 et seq. (the UCL). Pursuant to its misrepresentation claims, Stop sought the return of the money it paid to AOK on the basis that AOK misrepresented that the masks were NIOSH certified. Stop's claims for civil theft, conversion, and unjust enrichment were based on AOK's sale of

9

the 528,000 masks to another customer despite Stop having paid $580,000 for those masks. As to its unjust enrichment claim, Stop sought "restitution of the amount obtained by [AOK] from the proceeds of the sale of [Stop]'s goods to third parties." Stop also sought $50 million under its UCL claim. Stop did not assert claims for breach of contract or breach of the implied warranty of merchantability. Stop later advised the court that Stop did not pursue a breach of contract claim because the Uniform Commercial Code governed the transaction and Stop had accepted the goods.

2. *Trial and Closing Argument*

The court conducted a five-day bench trial. During opening statement, the court asked Stop, "[T]here is no breach of contract claim as against AOK . . . for failure to deliver the product that they promised?" Stop responded there was no "actual breach of contract, per se, because it's fraud. That's our argument."

Before and during the trial, Stop argued that as to AOK's breach of contract claim, the masks "are not NIOSH certified, as required by the contract. Because AOK did not perform under the contract and delivered infringing goods, it cannot sue for breach." As to its own claims, Stop argued the court should award it $4,914,880 (the amount Stop paid to AOK) on the theory that a party should not benefit from its own fraud, and AOK's fraudulent representation that the masks were NIOSH certified rendered the masks worthless. Stop also sought treble damages in the amount $1,160,000 for civil theft of the 528,000 masks.

During closing argument, Stop argued the Tooling defendants and/or AOK were "unjustly enriched by the [$]580,000 that they got to keep." In a single sentence that was cut off by the court, Stop also argued that if the court believed "the NIOSH

10

argument," then AOK had been unjustly enriched by an amount over $4 million.  Stop also argued that AOK fraudulently concealed that it did not obtain NIOSH approval and AOK had a duty to disclose that information because it "receiv[ed] payment on a contract where [it was] obligated to obtain NIOSH approval."  Stop argued, "the contract requires [AOK] to . . . get the approval."  Stop also sought $4,914,080 in restitution under their UCL claim.

The court requested supplemental briefs as to whether AOK's sale of the masks was unlawful under the UCL.  Relevant to this appeal, Stop's supplemental brief made several references to the contract requiring AOK to obtain NIOSH approval, including the following:  (1) "The contract explicitly required NIOSH approval.  AOK's failure to even try for approval is inexcusable . . . ."  (2) AOK's sale of the masks with a NIOSH label but without obtaining NIOSH approval when "the contract unambiguously imposed a duty on AOK to obtain NIOSH approval" was fraudulent and therefore an unfair business practice under the UCL.  (3) "The contract between AOK and Stop . . . required that the masks be NIOSH approved—the failure to even apply is a clear breach of that contractual duty giving rise to a duty to disclose that no effort was made to obtain NIOSH approval."

3.      *The Trial Court's Ruling, Statement of Decision, and Judgment*

On December 22, 2022, the court issued a written ruling on the parties' claims.  It found Stop could not succeed on its misrepresentation claims because it failed to prove that "a misrepresentation was made or relied upon."  The court also found that because the masks were illegal to sell, they had no

11

value, and Stop could not recover damages for civil theft or conversion. As to Stop's UCL claim, the court found that Stop failed to demonstrate a causal connection between a UCL violation and Stop's injury. The court stated, "[I]t is clear . . . that Stop['s] . . . main obstacle to selling the masks (it[]s injury) was not the NIOSH issue, but the collapsing market." As to Stop's single remaining claim for unjust enrichment, the court observed that unjust enrichment was not strictly a cause of action, but synonymous with the equitable remedy of restitution. It explained the basis for the remedy included contracts implied in law, quasi-contracts, or quantum meruit. It concluded AOK had been unjustly enriched in the amount of $2,306,424, the amount Stop had paid under the contract less AOK's costs for producing the masks.

As for AOK's breach of contract claim, the court found that AOK could not succeed on its breach of contract claim because "AOK breached the contract by failing to provide product of any value."

On January 3, 2023, AOK requested a statement of decision. In relation to the unjust enrichment claim, AOK asked the court to address whether Stop ever offered to return any of the masks it purchased from AOK and whether Stop's own actions, including knowing that the masks were not NIOSH approved, barred Stop from recovering under the doctrines of unclean hands, in pari delicto, waiver and/or estoppel, or unjust enrichment. It further asked the court to address whether the financial benefit Stop received in connection with the masks it purchased needed to be factored into the restitution calculation.

12

On June 26, 2023, the court issued a proposed statement of decision in which it repeated its December 22, 2022 findings and rulings without substantive change.

On July 6, 2023, AOK filed objections to the proposed statement of decision. Among other things, AOK argued that the court's ruling as to Stop's unjust enrichment claim was erroneous as a matter of law because there was no recognized cause of action for unjust enrichment in California and the quasi-contract theory of unjust enrichment was unavailable when there was an actual contract between the parties. AOK also argued, "Many of the issues relating to restitution were discussed in the context of Stop['s] . . . UCL claim and are also pertinent to Stop['s] . . . unjust enrichment claim. There was virtually no discussion on Stop['s] . . . unjust enrichment claim by either party at closing argument for various reasons including . . . because Stop . . . only indicated in its [c]ross-[c]omplaint that it was pursuing this theory based on its theft-based allegations which were addressed at length."

On July 20, 2023, the trial court issued a final statement of decision that was substantively the same as the court's December 22, 2022 ruling and June 26, 2023 tentative statement of decision.

On July 25, 2023, the court entered judgment, which included the unjust enrichment award to Stop. Stop served notice of entry of the judgment on August 7, 2023.

4.     *AOK's Code of Civil Procedure Section 663 Motion*

On August 22, 2023, AOK filed a Code of Civil Procedure section 663 motion to set aside and vacate the judgment as to the unjust enrichment cause of action and to enter a new and different judgment in AOK's favor. AOK argued unjust

13

enrichment is not a recognized cause of action in California and that Stop could not recover on a quasi-contractual theory because the parties had a binding contract. (*Stop I*, *supra*, 111 Cal.App.5th at p. 809.)

AOK also argued, "[A]ll of the predicate facts pled in support of Stop['s] . . . unjust enrichment claim were solely based on the 'theft' and resale of the two containers that Stop . . . alleged AOK 'stole.' . . . And the only recovery pled with respect to that claim was '[f]or restitution of the amount obtained by [AOK] from the proceeds of the sale of [those] goods to third parties.' . . . No allegation of any non-compliance with NIOSH's labeling rules was ever made in connection with that claim."

Stop opposed the motion, arguing that, among other things, AOK waived any objection to Stop's unjust enrichment claim by not objecting earlier, evidence supported the court's restitution award, AOK did not demonstrate prejudice from the variance between Stop's pleadings and the proof at trial, and that the law liberally allowed for the amendment of a complaint to conform to proof after trial. Stop further requested leave to amend its cross-complaint. The proposed amended cross-complaint added a new cause of action for "[r]ecission and/or [r]estitution" on the basis that AOK's failure to obtain NIOSH approval rendered the consideration Stop had bargained for unlawful and entirely void. Stop did not seek to amend its claim for unjust enrichment.

On October 19, 2023, the trial court granted AOK's motion but did not enter a new judgment. The court found AOK had been unjustly enriched but agreed that Stop could not pursue or recover under a quasi-contract theory because the parties had an enforceable agreement regarding the subject matter at issue. The court set a case management conference for November 8,

14

2023, for further proceedings as to the unjust enrichment claim. (*Stop I*, *supra*, 111 Cal.App.5th at p. 809.) The court's order did not address Stop's request to amend its cross-complaint.

On November 7, 2023, Stop filed a motion for leave to amend its cross-complaint to conform to proof. As before, its proposed first amended cross-complaint added a cause of action for rescission and/or restitution and left the unjust enrichment cause of action unchanged.

On November 11, 2023, AOK applied ex parte for an order correcting nunc pro tunc the court's prior October 19, 2023 order granting AOK's Code of Civil Procedure section 663 motion by directing entry of an amended judgment in favor of AOK on Stop's unjust enrichment claim. (*Stop I*, *supra*, 111 Cal.App.5th at p. 809.)

On November 17, 2023, the trial court granted AOK's request for entry of judgment. "It 'order[ed the] minute order of October 19, 2023 amended nunc pro tunc to add the words: [¶] An [a]mended [j]udgment in favor of AOK Tooling as to the [unjust enrichment] cause of action should enter.' " (*Stop I*, *supra*, 111 Cal.App.5th at p. 810.) The court executed an amended judgment that same day.

5. *Stop's Motion for a New Trial*

In December 2023, Stop moved for a new trial on the basis that the court's rulings on Stop's claims (including unjust enrichment) were inconsistent. Stop noted that if its motion was granted, it would seek to amend its cross-complaint to conform to proof to add a cause of action for recission. AOK opposed the motion.

On January 23, 2023, the court denied the new trial motion. As to Stop's arguments for unjust enrichment, the court

15

stated, "Stop argues that because the masks provided were not NIOSH approved, the contract was not enforceable [and therefore quasi-contractual recovery is available].  This contortionist of an argument is a brazen attempt to remedy Stop's egregious error of not asserting a breach of contract cause of action."  Although the record does not include an express ruling on Stop's requests to amend its cross-complaint, the court's denial of Stop's new trial motion effectively denied Stop's motion for leave to amend.  (*M.B. v. City of San Diego* (1991) 233 Cal.App.3d 699, 707 ["Generally, once judgment has been rendered, a plaintiff cannot amend a complaint unless the judgment is first vacated or a motion for a new trial is granted"].)

      6.    *The First Appeal*

Stop appealed from the amended judgment on the basis that the trial court was without jurisdiction to amend the judgment after the 75-day deadline and that the trial court's nunc pro tunc order had been improper.  We agreed and vacated the nunc pro tunc order and directed the trial court to reinstate its original July 25, 2023 judgment under which it found in favor of Stop on its claim for unjust enrichment against AOK.  We explained, "Should AOK have meritorious appellate arguments, it may appeal from the original judgment once the trial court reinstates it upon remand."  (*Stop I*, *supra*, 111 Cal.App.5th [nonpub. portion of partially pub. opn.].)

## DISCUSSION

### A.    AOK Has Not Forfeited Its Argument that Unjust Enrichment is Not a Cause of Action

We first address Stop's argument that AOK has forfeited its challenge to the unjust enrichment claim because it did not

16

demur or otherwise argue during trial that unjust enrichment was not a cause of action. Stop contends that defects in form, which are subject to a special demurrer, are waived if no special demurrer is interposed.

Although it is true in some circumstances that "[i]f the party against whom a . . . cross-complaint has been filed fails to object to the pleading, either by demurrer or answer, that party is deemed to have waived the objection" (Code Civ. Proc., § 430.80, subd. (a)), there are significant exceptions. One is that this general rule does not apply to "an objection that the pleading does not state facts sufficient to constitute a cause of action" (*ibid.*), which is precisely the nature of AOK's objection to Stop's unjust enrichment cause of action. "[A] general demurrer, which attacks the fundamental validity of the cause of action[,] . . . may be raised at any time." (*McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 283.)

Forfeiture is also not appropriate because Stop did not raise the unjust enrichment theory reflected in the trial court's ruling until closing argument. Stop's cause of action for unjust enrichment as pleaded was that Stop paid for 528,000 masks that AOK then sold to another customer. The theory advanced by Stop at closing argument, and relied upon in the original judgment, was that the over 3 million masks Stop purchased were worthless because AOK did not obtain NIOSH approval for the change in logo. AOK did not have notice of this unjust enrichment claim prior to or even during trial, and cannot be faulted for failing to demur to a claim that Stop had not yet even made.

**B.     Unjust Enrichment is Not a Cause of Action**

California courts are ostensibly split as to whether an independent cause of action for unjust enrichment exists.  Some courts appear to have recognized a separate cause of action, setting forth "[t]he elements of a cause of action for unjust enrichment."  (*Professional Tax Appeal v. Kennedy-Wilson Holdings, Inc.* (2018) 29 Cal.App.5th 230, 238; accord, *Lectrodryer v. SeoulBank* (2000) 77 Cal.App.4th 723, 726.)  But other courts, including this Division, have held "unjust enrichment is not a cause of action."  (*Jogani v. Superior Court* (2008) 165 Cal.App.4th 901, 911; see also *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1132; *Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793.)

We continue to adhere to our oft-repeated view that unjust enrichment is not a cause of action.  As we stated in *Melchior*, " 'The phrase "[u]njust [e]nrichment" does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so.'  [Citation.] Unjust enrichment is ' "a general principle, underlying various legal doctrines and remedies," ' rather than a remedy itself.  [Citation.]  It is synonymous with restitution."  (*Melchior v. New Line Productions, Inc.*, *supra*, 106 Cal.App.4th at p. 793.)

Stop urges us to overrule this prior precedent, contending our Supreme Court "disagree[d]" that there is no cause of action for unjust enrichment in *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39.  Stop points to *Ghirardo*'s statement that a cross-complainant was "entitled to seek relief under traditional equitable principles of unjust enrichment."  (*Ghirardo v. Antonioli*, *supra*, at p. 50.) But as Stop also acknowledges, the cross-complainant (who claimed to have a remaining balance due on a promissory note)

18

alleged a common count for payment of money, not a standalone cause of action for unjust enrichment.  (*Id.* at pp. 45-46, 54.)  That a case "address[es] the doctrine of unjust enrichment in discussing [a] remedy for a [separate] validly pleaded cause of action" does not mean that unjust enrichment can be alleged as a separate and independent cause of action.  (*LeBrun v. CBS Television Studios, Inc.* (2021) 68 Cal.App.5th 199, 210.)  Thus, nothing in *Ghirardo* calls into question our prior holdings that unjust enrichment is not a standalone cause of action.[5]

## C.    Stop Cannot State Claims for Quasi-contract or Rescission

Although unjust enrichment is not a cause of action, courts have sometimes recast it as a claim seeking restitution.  (*Rutherford Holdings, LLC v. Plaza Del Rey* (2014) 223 Cal.App.4th 221, 231.)  Stop urges us to do likewise.

---

[5] At oral argument, Stop identified for the first time two California Supreme Court cases that it contended demonstrated that court's approval of a standalone cause of action for unjust enrichment: *Buss v. Superior Court* (1997) 16 Cal.4th 35 and *Hartford Casualty Ins. Co. v. J.R. Marketing, LLC* (2015) 61 Cal.4th 988.  Neither case expressly considers whether unjust enrichment is a standalone cause of action.  " 'Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered.' "  (*People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 65-66.)  Further, both cases involved a situation unique to insurance claims: an insurance company's right to reimbursement for defense costs incurred by its insured that were not provided for under the policy.  This case presents no such facts.

19

"There are several potential bases for a cause of action seeking restitution.  For example, restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason.  [Citations.]  Alternatively, restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct.  In such cases, the plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory (an election referred to at common law as 'waiving the tort and suing in assumpsit').  [Citations.]  In such cases, where appropriate, the law will imply a contract (or rather, a quasi-contract), without regard to the parties' intent, in order to avoid unjust enrichment."  (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 388, fn. omitted.)  "A plaintiff may not, however, pursue or recover on a quasi-contract claim if the parties have an enforceable agreement regarding a particular subject matter." (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1388.)

We take these two alternative bases for restitution in reverse order, beginning with quasi-contract and then turning to rescission.

1. *Quasi-contract*

AOK argues that because the parties had a contract governing the issue of NIOSH approval, Stop cannot simply relabel its unjust enrichment claim as one for quasi-contract. Stop responds that the contract did not actually address the subject matter at issue, as "the contract does not explicitly impose a duty on AOK to obtain that approval."

Stop contended the opposite before the trial court and is judicially estopped from arguing to the contrary on appeal.  "In

California, courts consider five factors in determining whether to apply judicial estoppel:  'The doctrine [most appropriately] applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." ' " (*Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 169.)

Before the trial court, and in contrast to Stop's current position that "the contract does not explicitly impose a duty on AOK to obtain [NIOSH] approval," Stop argued that the contract "explicitly" and "unambiguously" required NIOSH approval.  Stop further argued that AOK breached the contract by failing to obtain NIOSH approval for the masks it delivered, and therefore, AOK could not maintain a cause of action for breach of contract.  This position was not taken as a result of ignorance, fraud, or mistake; it was intentional and helped Stop succeed in defeating AOK's breach of contract claim.  The court's judgment states as a reason for ruling in Stop's favor on that claim that "AOK breached the contract by failing to provide product of any value, inter alia, . . . by failing to obtain NIOSH approval for the goods it delivered, a direct violation of the terms of the contract."

Stop contends judicial estoppel should not apply because it argued only the contract was "silent as to the responsibility to obtain NIOSH approval for the labeling changes" and AOK's obligation instead arose pursuant to federal regulations.  As just explained, we reject that characterization.

But even if one accepts for the sake of argument that NIOSH approval was an implied rather than express contractual

21

term, Stop could not recover under a quasi-contract theory. " 'When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract.' " (*Klein v. Chevron U.S.A., Inc.*, *supra*, 202 Cal.App.4th at p. 1388.) At a minimum ~(paragraphs deleted)~ the parties understood the contract necessarily implied NIOSH approval was required. Stop's principal Wong testified at trial that the contract implied that AOK would obtain such approval before production, and Stop admits on appeal that the requirement AOK obtain NIOSH approval was an "implied covenant" and a contractual term that "must be implied." The failure to perform a necessary implied condition or implied covenant is a breach of contract and is not subject to equitable remedies. (See *Digerati Holdings, LLC v. Young Money Entertainment, LLC* (2011) 194 Cal.App.4th 873, 885; *Tricor California, Inc. v. State Compensation Ins. Fund* (1994) 30 Cal.App.4th 230, 238.)

 2. *Rescission*

 Stop asserts that AOK's appeal still fails because, even if we accept AOK's argument that quasi-contract relief is not available, Stop could sue under section 1689, subdivision (b) to rescind the contract based on a failure of consideration and obtain restitution. Stop identifies the following subparts of section 1689, subdivision (b) as applicable: "A party to a contract may rescind the contract in the following cases: [¶] . . . [¶] (2) If the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds. [¶] (3) If the consideration for the obligation of the rescinding party becomes entirely void from any cause. [¶] (4) If

22

the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause. [¶] (5) If the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault. [¶] (6) If the public interest will be prejudiced by permitting the contract to stand." (§ 1689, subd. (b)(2)-(6).) Stop contends it proved a right to rescission and restitution at trial.

"[T]he adequacy of the pleadings to raise [a particular] claim is a question of law that may be considered for the first time on appeal." (*Simmons v. Ware* (2013) 213 Cal.App.4th 1035, 1050.) Although Stop could have sued for rescission under section 1689, it did not allege a claim for rescission in its operative cross-complaint. This precludes Stop from recovering on such a claim. "The pleadings establish the scope of an action" (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1091), and "a party must recover on the cause of action alleged in the complaint and not on a separate and distinct cause of action disclosed by the evidence" (*People v. Toomey* (1985) 157 Cal.App.3d 1, 11).

Stop argues it could have amended its cross-complaint to rename the unjust enrichment claim as one for recission, including amending to conform to proof at trial. This ignores that Stop's unjust enrichment claim as pleaded (which concerned the resale of 528,000 masks for which Stop had paid $580,000 and was duplicative of its conversion claim) varied materially from the theory it introduced for the first time at closing argument that AOK was unjustly enriched by all the money Stop paid to it because AOK did not obtain NIOSH approval. This is not a matter of incorrect labeling; the two claims involve different facts and different defense strategies. Amendment of a pleading to

23

conform to the proof is not allowed when it raises new issues not included in the original pleadings and upon which the adverse party had no opportunity to defend. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1378.)

As AOK points out, allowing Stop to add a cause of action for rescission after the close of evidence would have prejudiced AOK by hindering its ability to raise defenses to that new claim. For example, AOK argues that the California Commercial Code "bar[s] . . . any remedy" to a purchaser that accepted goods and did not, in a reasonable time, notify the seller of a breach (Com. Code, § 2607, subd. (3)(A)) and that a buyer can only revoke acceptance of the goods within a reasonable time after the buyer discovered or should have discovered the ground for revoking acceptance (*id*., § 2608, subd. (b)(2)).

Further, AOK contends it would have argued that Stop did not promptly give notice of its intent to rescind the contract and tender the benefits Stop received thereunder to AOK. Although section 1691 states, "the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both," Stop never served an operative pleading asserting its rescission claim and only sought to amend its cross-complaint in September 2023, after judgment had been entered. Under the facts here, Stop's late effort to assert a rescission claim does not comport with section 1691's requirement that the party seeking to rescind "promptly upon discovering the facts which entitle him to rescind" provide notice and offer to restore everything of value. (§ 1691.)

Throughout the litigation, Stop disclaimed any reliance on contractual theories and elected to sue for tort damages. Having

lost on those claims, Stop cannot at this late date attempt to pursue the equitable contract remedy of recission/restitution. (See *Helm v. K.O.G. Alarm Co.* (1992) 4 Cal.App.4th 194, 204, fn. 10.)  Nor is it entitled at this late date (Stop did not appeal the court's denial of Stop's new trial motion related to the unjust enrichment claim) to a do-over in the form of a new trial.

## DISPOSITION

The court's July 25, 2023 judgment is reversed only as to Stop's fifth cause of action in its cross-complaint for unjust enrichment, and the court is directed to issue an amended judgment as to this claim finding in AOK's favor.  The judgment is otherwise affirmed.  AOK is awarded its costs on appeal.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.

M. KIM, J.

25